Gilbert, J.
This is an application on behalf of the prisoner, to admit him to bail. He is under indictment for murder in the first degree ; he has been twice tried, and on both occasions the jury were unable to agree upon a verdict. His counsel now claim that these disagreements of the jury create such a doubt of the prisoner’s guilt as entitles him to he bailed.
The power of the supreme court, or of a justice thereof, to bail in all cases, whether it be treason, murder, arson, or any other offense, is indisputable (Exp. Tayloe, 5 Cow., 39; People v. Godwin, 5 City Hall Rec., 11; People v. Van Horne, 8 Barb., 162; People v. Baker, 10 How. Pr., 567).
This power to bail may be exercised either before or after indictment. Whether the power shall be exercised or not, rests in the discretion of the court. This discretion is not an arbitrary, but a judicial one, and is governed by established principles and precedents.
I Generally speaking, bail will be refused after indictment, in any case where the punishment is death or a degrading imprisonment, because the indictment makes a strong presumption of guilt, and experience teaches . that in such cases the accused will attempt to elude the demands of justice. But where it stands indifferent whether the prisoner be guilty or innocent, bail ought, in most cases, to be allowed.
In the case of People v. Godwin (supra), this sub *29 ject was discussed by that great and learned and upright judge, tiie late Ch. J. Spencer, and his decision has never been questioned, but has been repeatedly sanctioned by the courts of this and other States (Cases supra; People v. Linden, 19 Cal., 539). He says “there is no certain or fixed rule in cases of felony ; each particular case depending on its peculiar circumstances. The object and end of imprisonment before trial is to secure the forthcoming of a person charged with the commission of a crime, and it is never intended as any part of the punishment, for until the guilt of the party is legally ascertained, there is no ground of punishment, and it would be cruel and unjust to inflict it. The law of every free government estimates personal liberty as of the most sacred character, and it ought not to be violated or abridged before trial, but in cases where there are strong presumptions of guilt.”
This case occurred fifty years ago. The prisoner was committed upon a coroner’s inquisition for murder. He was indicted for manslaughter. On the trial the jury rendered a verdict of guilty. On motion of his counsel the jurors were polled, when the third one called, expressed his disSent from this verdict. They were again sent out, but were finally discharged, having been unable to agree.
In granting the motion to be admitted to bail, Chief Justice Spencer further observes : “It appears to me from the facts before me, the conclusion is inevitable that it is quite doubtful whether the prisoner is guilty,- and I think it stands indifferent whether he is so or not. I must presume that the jurors are impartial, and that •their final disagreement proceeded from a conscientious difference of opinion as to the prisoner’s guilt, and I am, therefore, bound to conclude that the prisoner may be innocent of the offense. In such a case, as I understand the law, he is entitled to be bailed.','>
As I before remarked, this case has never been questioned, but, on the contrary, stands on the strength of its reasoning, and by the sanction afforded by its fre *30 quent approval since, as the law of the land. In the case of Tayloe (supra) the principle was approved emphatically, and Mr. Judge Woodworth said: “Undoubtedly the true rule of law is here laid down by the chief justice, and it is expressed with his usual precision and perspicuity.”
Since this decision was made, the work of ameliorating the criminal code has been going on, and now, in most of the States of the Union, the right to bail even in capital cases, unless the proof is evident, or the presumption great, is secured by express constitutional provisions. In our own State this right has not been embodied in the fundamental law, but has still been entrusted to the highest court of original jurisdiction, or to the members thereof. The duty of affording protection in proper cases, however, is imperative, and, in determining whether the particular case is proper or not, we may welk adopt the constitutional principle of our sister States in favor of liberty, and allow bail, unless the proof is evident, or the presumption great.
In the case before me, the district-attorney insisted that, notwithstanding two juries have been unable to agree upon a verdict, the guilt of the prisoner is clear, and that the jury could not have failed to agree in either instance, _if the court had not erroneously excluded evidence of the dying declarations of the deceased, and misdirected the jury upon the law of the case, and misled them in reviewing the evidence, when the case was submitted to them.
With respect to the exclusion of the dying declarations, I am of the opinion that the ruling of the judge was clearly correct. The general rule is, that all testimony is inadmissible which has not the sanction of a judicial oath. The case of declarations made by a person under the apprehension of impending dissolution, is an exception to the rule. The principle upon .which this exception stands is very clear and obvious. It is presumed that a person, knowing that his dissolution is fast approaching,, that he is on the verge of eternity, *31 and that he is to be called to an immediate account for all- that he has done amiss, before a Judge “from whom no secret^ are hid,” will feel as strong a motive to declare the truth, and to abstain from deception, as any person who acts under the obligation of an oath. So jealous is the law Of any deviation from the general rule, that it confines the exception to the necessity of the casé, and only renders such declarations admissible when they relate to the canse of death, and are tendered on a criminal charge respecting it, nor then, unless the ‘court be first satisfied that the party who made the declaration was under the impression of approaching death, and was without hope of recovery (Slark. on Ev., 32, 88; 1 Phill. on Ev., Edw. ed., 285, 299).
The 'only evidence offered for the purpose of laying a foundation for the introduction of the declarations of the deceased, was the following :
“ John Cowan,—Is a policeman ; first saw Hayes in a coach in front of the station-house ; assisted in taking him in; Sergeant Latting was behind the desk ; spoke to the sergeant while Jie (witness) was stoqping over Hayes.
“ Q. State your exact position.
“A. I had taken my left hand from under Mm ; my right hand was at his shoulder, and I was stooping over when I spoke to the sergeant. The sergeant was then behind his desk, about five feet from witness ; the sergeant heard me.
“ What did you say X
“A. I said to the sergeant that I thought the man was dying.
“ Q. Did Hayes say or do anything at that time X
“A. He did.
“ Q. Did he speak then X
“A. No.
“ Q. What did he do X
“ Q. The Court.—You say he did not speak X
“A. No.
*32 “ Q. What did he do ?
“ A. He nodded his head when I spoke.
“ Q. How state how he nodded his head ? #
“A. I had him partially laid down; his head not on the ground, and his shoulders not on the ground, and lie nodded his head that way ; his shoulders were not on. the ground, nor his head.
“ Q. Juror.—Would it be proper to ask, if, when he nodded his head, anything was said to him 1
“ The Court.—This evidence, which is being taken now, is not evidence at all to go to the jury. The district-attorney is trying to lay a foundation to put 'in a declaration made by Hayes.
“ District-attorney.—This is for the court simply.
“Q. How long after you made the remark to the sergeant that you have stated, was it that he nodded his head, as you have mentioned ?
“A. I was about finishing the sentence.
“Q. Immediately then ?
“A. Immediately, yes.
“ Q. Was Dr. Stone there at that time ?
“A. Hot at that time,—no.
“ Q. How long was it after he had been carried into the station-house ?
“A. Immediately after.
“ Richard Lotting, sergeant of police.—Was in station-house; noticed his (Hayes’s) condition; he appeared to be very weak; his eyes were closed ; I thought the man was dying ; Cowan told me over the desk that he thought the man was dying ; did not notice whether Hayes did anything at the time; came round afterwards from behind the desk, and went to Hayes ; he was able to speak then ; he was able to understand questions put to him.
1 ‘ Q. Did he say anything—not what he said—except in reply to questions ?
“A. He did not; he was taken then to hospital; was not able to stand; witness was present'when Dr. Stone was there.
*33 “ Q. Did you hear Dr. Stone state that he was in a dying condition ?
“A. Í asked Dr. Stone what we were to do with him, and he said we had better send him to the hospital.
£I'Q. Did he state as to his condition ?
<£ A. He thought the man was going to die.
11 Dr. Richard Stone......
“ Q. Did you see the man ?
“A. I did.
££ Q. Where was he?
“A. He was lying on the floor in front of the desk.
££ Q. What was his condition?
“ A. He was in a dying condition.
“ Q. Did you say anything to him as to his condition?
“A. I did.
Q. Where were yon when you said it ?
“A. -I was leaning over the man.
“ Q. What did you say ?
“A. I said he was dying, or in a dying ¡condition, or words to that effect;
££ Q. How did you speak ?
“A. I spoke in an ordinary tone of voice, such, perhaps, as I am using now.
“ Q. Sufficiently loud for the man to hear you ? .
“ Q. How far were you from him at the time ?
61 A. My hand was on the man’s body, and I was leaning over him.
£ £ Q. ‘To whom did you direct your conversation or remarks, ?
“ A. To the policemen around ; I do not know as I looked at any man particularly ; I was looking at the man who was dying.
“Q. Your remarks were addressed to other parties, and not to the man himself?
“A. Well, merely for the information of those standing around.
££ Q. Did the man say anything while he was there ?
“A. He did.
*34 “ Q. Before or. after you made the remark or statement that he was in a dying condition, or dying %
“A. I think both before and after.
“No cross-examination.
“District-attorney.—I want to call him again at another stage.
“ (He did not call him again.)”
It needs no observation to show that this was wholly insufficient. It would have been easy for the public prosecutor to have given medical testimony as to what would have necessarily been the mental consciousness on this subject of a person in the condition of the deceased, or other more direct evidence of the actual state of his mind on this point, at the time the declarations were made ; and it seems strange that he made no effort to do so, as the testimony of the declarations would have been of vital importance.
I have carefully perused the charge of the judge, and find in it no erroneous statement of the law. On the contrary, the legal propositions in the case were presented to the jury with remarkable accuracy, precision and perspicuity. The public prosecutor complains that the judge refused to charge that murder was a conclusive presumption, from the fact of killing with a deadly weapon. But this never was the law. “Express malice,” which is another form of stating the idea of “premeditated design,” under our statute always has to be proved. There are cases where such “premeditated design” may be inferred from the killing alone ; still, in such cases, the circumstances attending the homicide must be unequivocal, admitting of only one conclusion. This rule manifestly has no application to the facts of this case. Nobody saw the act done. The prisoner gave evidence to prove that even if he filed the shot he was not in a condition to know what he did. And the prosecution proved his declaration that he had been fired at, and that he had fired back. This evidence may have been wholly unsatisfac *35 tory or incredible, but it was the duty of the court to submit it to the jury, and it was their province exclusively to determine its effect.
The case of Yates (32 JSÍ. Y.,' 516) is a signal illustrai tion of the true rule, and shows that if the rule conj 7 ’ tended for by the public prosecutor had been adopted, ■' a conviction would have been erroneous, and would have been set aside. In that case, Yates shot a police officer. The circumstances were unequivocal, but whether it was murder or not depended on the fact whether he knew the person he killed was an officer, and it was held to be incumbent on the public prosecutor to satisfy the jury of this fact upon the evidence. . I have no time to discuss the law upon this subject at length. Suffice it to say, that the existence of “premeditated design” is always a fact to be proved.
With respect to the manner of presenting the facts by the presiding justice, and his comments thereon, to the jury, that is a subject with which I have nothing to do. It is not suggested that he misstated the evidence. He had a right to present his own views of its effect; but, after all, it was the province of the jury to determine all questions of fact, and so were the jury instructed. I have not felt at liberty to express any opinion as to the conclusion to which the evidence in the case tends. For manifest reasons it would be highly improper for me to do so. The prisoner’s counsel contends with great earnestness that it is wholly insufficient to implicate his client. The district-attorney, on the other hand, insists that the prisoner’s guilt was established beyond a doubt. Upon the latter hypothesis, it is difficult to perceive why the district-attorney gave in evidence the prisoner’s declaration after the homicide, that “ he had been fired at and fired back.” This manifestly created great embarrassment in determining the case.
It is no doubt to be deplored that the case has not been determined, but, in seeking for the cause of the *36 failure, it is wrong to attribute it to the partiality of the court, or to any fault on the part of the jury. Some importance should be given to the omission to get in the dying declarations, and something allowed for the damaging effect upon the case of the prosecution, of the prisoner’s declaration, made after the homicide. In doing this,, however, it is not necessary to impute incompetency or imbecility to the district-attorney, even though it should be deemed that the blunders referred to may have aided in producing the result of the trial. ■In regard to the statement contained in the affidavit of S. D. Morris, relative to what occurred between the presiding justice and himself, immediately after the trial, I forbear to comment. This statement may fitly be reserved for investigation elsewhere. The affidavits will be filed ; and as I deem the case one in which it would he a discreet and sound exercise of the power to bail, the prisoner will be let to bail accordingly : himself in twenty thousand dollars, with four sureties of competent ability, in five thousand dollars each, for his appearance at the next court of oyer and terminer to be held in this county.
Note.—The recent case of Queen v. Jenkins, determined by the English court for crown cases reserved, in April, 1869 (1 Law Rip. 0. Gas. R., 187), further illustrates this subject, and confirms the doctrine lard down in the case above.
• On the trial of Jenkins for the murder of Fanny Peeves, a written declaration of the deceased was put in evidence for the prosecution. The declaration was made on oath to a magistrate’s clerk, about thirteen hours before death. The clerk asked the deceased, before he took down her statement, whether she felt she was in a dangerous state—whether she felt she was likely to die. She said, “ I think so.” He asked, “ Why? ” She replied, “ From the shortness of my breath.” Her breath was ex-trembly short, and her answers were disjointed by it, some intervals elapsing between .them. The clerk then said, “Is it with the fear of death before you that you make these statements ? ” — and added, “ Have you any present hope of your recovery ? ” She said, “None.” The statement, as written out by the clerk, said that, “ I feel that I am likely to die; and I have made the above statement with the fear of death before me, and with no hope of my recovery;” thus omitting the word “ present” before the word “ hope;” but on reading it over to the deceased, she suggested the words “ at present.” She said, “ No hope at present of my recovery.” The word “ present ” was accordingly interlined by the clerk.
The other evidence was such that the conviction rested on the admissibility of-this declaration.
Held, that it was not admissible. “ The result of the decisions is,” said Kelly, C. 33., “ that there must be an unqualified belief in the nearness of death; a belief without hope that the declarant is to die.......
We, as judges, must be perfectly satisfied beyond a reasonable doubt that there was no hope of avoiding death; and it is not unimportant to observe that the burden of proving the facts that render the declaration admissible is upon the prosecution.”
Byles, J., who admitted the declaration on the trial, reserving the question, concurred in quashing the conviction. He said, “ In order to make the dying declaration admissible, there must be an expectation of impending and almost immediate death. The authorities show that there must be no hope wnatever."